**UNITED STATES of America ex rel. Robert MURRAY, Petitioner,**

**v.**

**Chester D. OWENS, Superintendent of Elmira Reception Center, Elmira, New York, et al., Respondents.**

**No. 71 Civ. 5683.**

United States District Court,
S. D. New York.

March 29, 1972.

Charles Schinitsky, Brooklyn, N. Y., William E. Hellerstein, New York City, for petitioner, by Michael Gage, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, for State respond-

---

ents, by Robert S. Hammer, New York City, of counsel.

J. Lee Rankin, Corp. Counsel, for City respondent, by Joseph I. Lauer, New York City, of counsel.

GURFEIN, District Judge.

The petitioner, a fifteen-year-old at the time of his sentence to three years' commitment to Elmira Reception Center, brings this petition for a writ of habeas corpus. He was sentenced by the Bronx County Family Court after a juvenile delinquency proceeding in which a motion for trial by jury was denied. The commitment to Elmira is authorized by the New York Family Court Act § 758 (b). That section, in pertinent part, reads as follows:

"(b) Upon an adjudication of delinquency of a person who is fifteen years of age at the time of the commission of any act which, if committed by an adult, would be a class A or a class B felony as defined in the penal law, commitment may be for males to Elmira reception center * * *"

His conviction and commitment were appealed, *inter alia*, upon federal constitutional grounds. The New York Court of Appeals dismissed the appeal.[1] He then brought an action in this Court under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201, 2202 seeking a declaratory judgment and injunctive relief. He moved in that action for the convening of a three-judge court and for a temporary restraining order against his transfer from the Spofford Juvenile Center, where he was held, to Elmira Reception Center. I held that in a civil rights action the doctrine of res judicata applied, and that the adverse decision of the New York Court of Appeals could not be relitigated in that type of action. Murray v. Oswald, 333 F.Supp. 490, 493 (S.D. N.Y.1971); see Lackawanna Police Benevolent Ass'n v. Balen, 446 F.2d 52 (2 Cir. 1971). I suggested, however, that habeas corpus might be a proper

remedy, since there is no defense of res judicata in such a proceeding where constitutional issues are involved. Brown v. Allen, 344 U.S. 443, 506–08, 73 S.Ct. 397, 97 L.Ed. 469 (1953). And the petitioner's failure to seek review in the United States Supreme Court would not be fatal on the question of exhaustion of remedies. See Fay v. Noia, 372 U.S. 391, 435–36, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).[2]

Accordingly, the petitioner now seeks the writ and this Court is obliged to consider the constitutional issues, without benefit or need of a three-judge court. Wilson v. Gooding, 431 F.2d 855 (5 Cir. 1970); United States ex rel. Laino v. Warden, 246 F.Supp. 72, 92 n. 16 (S.D.N.Y.1965), aff'd, 355 F.2d 208 (2 Cir. 1966). The petitioner urges that he was denied his constitutional rights to due process and equal protection because he was committed to a penal facility without a jury trial. Habeas corpus is available not only to an applicant who claims he is entitled to be free of all restraints, but also to an applicant who protests that his confinement in a certain place vitiates the justification for confinement. See Creek v. Stone, 379 F.2d 106, 109 (D.C. Cir. 1967).

The constitutional issue is one of narrow application, but it nevertheless must be decided. The equal protection argument runs as follows. The New York statute, as we have seen, applies only to the class of fifteen-year-olds who commit acts equivalent to serious crimes. A juvenile of fourteen, who has committed the same acts as Murray, may not be sent to the Elmira Reception Center. Youths of sixteen to nineteen (youthful offenders) may be sent to Elmira, but if the prosecution is for a serious crime, they are entitled to a jury trial. People v. Michael A.C., 27 N.Y.2d 79, 86, 313 N.Y.S.2d 695, 261 N.E.2d 620 (1970). In other words, if the petitioner had been fourteen or sixteen, rather than fifteen, he could not legally have been tried and

1. For the history of the appeal, see my earlier opinion in Murray v. Oswald, 333 F. Supp. 490 (S.D.N.Y.1971).

2. And I now hold that the petitioner did adequately exhaust his state remedies.

committed as he was. Singling out his small class for curtailment of rights is alleged to be violative of the principle of Baxstrom v. Herold, 383 U.S. 107, 111–12, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966).

The due process argument centers on the idea that it is fundamentally unfair to try the offender as a child, but then to imprison him as an adult. It has been noted that in certain juvenile courts "the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children." Kent v. United States, 383 U.S. 541, 556, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966). Here the incongruity between "solicitous care" and "the protections accorded to adults" does not arise from the failure of the care in fact to meet intended standards, but rather from a legislative permission to make this very incongruity a part of the judicial process.[3]

The juvenile court system was first instituted in 1899 in Cook County, Illinois. It was assumed that the informality of the procedure would give the judge insight into available means to deal with the juvenile other than imprisonment with criminals.[4] The purpose was not to escape the burdensome necessity of a jury trial in order to give the juvenile *less* protection than if he were adult. Rather the safeguard of jury trial was traded for a sympathetic review by the judge of the personality of the particular juvenile so that more useful *treatment* could be ordered. As was said in Pee v. United States, 107 U.S.App.D.C. 47, 274 F.2d 556, 558 (1959), under the juvenile court procedure "such a one" is "not punished as a criminal."[5]

The growth of separate juvenile courts was, accordingly, accompanied in New York and many other states by the development of separate institutions for the juvenile delinquent. "The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals." In re Gault, 387 U.S. 1, 15, 87 S.Ct. 1428, 1437, 18 L.Ed.2d 527 (1967). In New York, two systems of institutions for confinement have evolved, one for juveniles under the Division for Youth and the other for adults and youthful offenders under the Department of Correction. The State Training Schools, which take boys adjudicated to be juvenile delinquents for conduct while

---

3. Dorsen & Resneck, In Re Gault and the Future of Juvenile Law, 1 Family L.Q. 1, 45 n. 174 (1967) :

"Perhaps the most exigent case for . . . judicial intervention is presented by the extraordinary practice in some states of transferring juveniles committed as delinquents to adult penal institutions where they may be confined together with adult felons. Such a practice is wholly at variance with the juvenile court's professed objective of treatment, and it is difficult to see how it can be lawfully carried on without granting the juvenile all the constitutional guarantees of adults charged with crime. *See* In re Rich, 125 Vt. 373, 261 A.2d 266 (1966) ; White v. Reid, 126 F.Supp. 867 (D.D.C. 1954). *But see* Wilson v. Coughlin, 147 N.W.2d 175 (Iowa Sup.Ct.1966)."

President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Juvenile Delinquency and Youth Crime 421 (1967) :

"If . . . facilities are lacking at the treatment stage, then the major rationale for the withdrawal of some of the safeguards provided by the criminal court is also lacking."

4. See Mack, The Juvenile Court, 23 Harv. L.Rev. 104, 107 (1909). Judge Julian W. Mack, a pioneer juvenile court judge, later was a distinguished United States Circuit Judge.

5. Judge Mack testified in hearings on the District of Columbia Juvenile Court Act as follows: "the moment the State holds the child responsible as a criminal, then the child has a constitutional right to those safeguards that are accorded under the Constitution to all criminals, irrespective of age." (Quoted in United States ex rel. Stinnett v. Hegstrom, 178 F.Supp. 17, 20 (D.Conn.1959.) ) See also Mack, *supra*, 23 Harv.L.Rev. at 114: "If a child must be taken away from its home, if for the natural parental care that of the state is to be substituted, a real school, not a prison in disguise, must be provided."

under the age of sixteen, are supervised by the Division for Youth; see N.Y. Laws 1971, c. 947, § 3. The Elmira Reception Center, on the other hand, normally takes only males over sixteen. It is a medium security facility which is administered by the Department of Correction, as part of the State prison system, and which functions as a way-station for the purpose of "reception, classification and program-planning." See N.Y.Correction Law, McKinney Consol. Laws c. 43, §§ 2, 70–72; 7 N.Y.C.R.R. §§ 100.75(b) & (c), 150.1(c). Any individual received at the Reception Center (and this would presumably apply to the petitioner) may be sent elsewhere within the State prison system, including a maximum security prison, under the authority of N.Y.Correction Law § 23 permitting administrative transfers.

It is clear, therefore, that the petitioner has been sentenced to imprisonment for three yars in a facility in which juveniles generally are not placed and where his fellow inmates will not have been sentenced to a three-year term without benefit of trial by jury. Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); Baldwin v. New York, 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed. 2d 437 (1969); People v. Michael A.C., *supra*.

New York seeks to justify this anomaly by urging that there is a compelling State interest in fostering the juvenile court system and that the alternative disposition provided by Section 758(b) should be viewed as a legitimate and rational part of the total scheme, the coincident absence of a jury trial also being considered as an integral part of that system. It contends that it is reasonable for the Legislature to differentiate, for purposes of disposition, between older, hardened, violent delinquents and other juvenile delinquents. It notes, quite properly, that the older, hardened delinquent might corrupt those younger boys placed in a Training School and sub-

stantially reduce or destroy the School's rehabilitative function. As I indicated in my earlier opinion (333 F.Supp. at 493), "a boy of fifteen may be as precocious in the field of criminality as another might be in better fields of endeavor." So it is, indeed, rational for the New York Legislature to make provision for keeping the very bad, older youngster from corrupting the younger children.

This still leaves open the question of what procedure is to be followed as a preliminary to this prophylactic segregation. Many state courts, in upholding the constitutionality of juvenile court acts, have emphasized not only that the proceedings are non-criminal, but also that the *institution* to which the delinquent is being committed is not of a penal character. See the state cases collected in White v. Reid, 125 F.Supp. 647, 649–50 (D.D.C.1954). But Surrogate Midonick, formerly of the New York Family Court, has noted that:

> ". . . it should be observed that non-juvenile reformatories such as the Elmira Reception Center and Westfield State Farms in New York, while they also are engaged in the quest for rehabilitation and treatment (as any decent penal institution should be), are not capable of dealing with juveniles as juveniles. The very age differential of the inmates makes treatment of a juvenile in a non-juvenile facility quite inadequate and often harmful because of the inappropriate mingling of fifteen-year-olds with inmates up to age 21 and over." M. Midonick, Children, Parents and the Courts 25 (1972).[6]

Formerly, in New York a juvenile could be held for trial as an adult, or removed to Family Court. N.Y.Family Court Act § 715 (1963); N.Y.Code Crim. Proc. §§ 312–c & 312–f (1958). In 1967, instead of continuing this concurrent jurisdiction over juveniles, exclusive jurisdiction of children up to age 16 was conferred upon the Family Court. N.Y.

---

6. The sharpness of this very distinction has also been recognized by the New York Court of Appeals. Jesmer v. Dundon, 29

N.Y.2d 5, 10 & n. 4, 271 N.E.2d 905 (1971).

Laws 1967, c. 680, § 87; Family Court Act §§ 712–13. This was a progressive measure, but while creating the exclusive jurisdiction, the provision regarding fifteen-year-olds in § 758(b) of the Family Court Act was permitted to remain with only formal changes. In summary, the situation today in New York is that the precociously criminal fifteen-year-old can be sent to an adult penal facility after a non-jury trial in Family Court. It is this combination of procedure and disposition, not the disposition alone, which is under attack.

In recent years attention has centered upon the constitutional rights of juveniles. In *In re Gault,* juveniles were held to possess rights inherent in due process —"neither the Fourteenth Amendment nor the Bill of Rights is for adults alone" (387 U.S. at 13, 87 S.Ct. at 1436).

There was no occasion to decide in *Gault* whether, as part of the Sixth Amendment guarantee (carried over to the states by the Fourteenth) or as part of due process itself, the juvenile was entitled to a jury trial. Thereafter, the Supreme Court held in the non-juvenile field that "trial by jury in criminal cases is fundamental to the American scheme of justice," Duncan v. Louisiana, 391 U.S. at 149, 88 S.Ct. at 1447, and that any prosecution in which the possible confinement could exceed six months required a jury trial as a matter of due process. Baldwin v. New York, *supra.*

Thus, by the doctrine of *Gault* the juvenile appeared to have rights to due process like an adult, and by the doctrine of *Duncan* and *Baldwin* the right to due process included the right to trial by jury.[7] This apparent syllogism to the contrary notwithstanding, the juvenile was not destined to get his trial by jury. First the New York Court of Appeals, in In re Daniel D., 27 N.Y.2d 90, 313 N.Y.S. 2d 704, 261 N.E.2d 627 (1970), and then the Supreme Court, held that juvenile court proceedings do not require jury trials in order to conform to the Consti-

tution. McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).

The *McKeiver* plurality opinion of the Court, written by Mr. Justice Blackmun, broke the syllogism by stating that "the juvenile court proceeding has not yet been held to be a 'criminal prosecution,' within the meaning and reach of the Sixth Amendment" (403 U.S. at 541, 91 S.Ct. at 1984). Mr. Justice Harlan concurred because he did not feel constrained by *stare decisis* to follow *Duncan,* from which he had dissented, but he commented: "I do not see why, given *Duncan,* juveniles as well as adults would not be constitutionally entitled to jury trials, so long as juvenile delinquency systems are not restructured to fit their original purpose" (403 U.S. at 557, 91 S.Ct. at 1992). There is no doubt, however, that a majority of the Supreme Court did hold that, even though the juvenile court system in practice leaves much to be desired in many places, it is still of sufficient social utility to permit its basic procedure to be sustained. At the same time, all the Justices except Mr. Justice Harlan, accepted the continued validity of *Duncan.*

*McKeiver* represented a clash between two sets of reformers—the progeny of the Jane Addams school of reform in the handling of juveniles and the civil libertarians who, often enough, had probably been themselves supporters of juvenile courts. A contrary decision in *McKeiver* might conceivably have sounded the death knell for juvenile courts as we know them, for jury trials are alien to their essential philosophy.

Mr. Justice Blackmun emphasized in *McKeiver* the benevolence of the juvenile court system, justifying the informality of the input and adjudicative procedures by the resulting effort at rehabilitation. The effort at *rehabilitation,* in my opinion, lay at the heart of the decision and essentially justified exclusion of the juvenile from the safeguards of *Duncan*

---

7. In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), had held on *Gault*-like reasoning that juveniles, like

adults, are entitled to a standard of proof beyond a reasonable doubt when they are charged with a violation of criminal law.

and *Baldwin.* The Court did not consider, or certainly not with any emphasis, the problem we must now consider. If the dispositional end of the procedure is to jail the child with more mature criminals, under a relatively substantial sentence, then to what avail is the destruction of constitutional safeguards?[8] *McKeiver,* I believe, did not purport to answer this. While confinement for more than six months in a proper *juvenile* institution would not mandate a trial by jury despite *Duncan,* there was no answer given to the question that confronts us in this case. If the disposition of the fifteen-year-old juvenile is not only for a term of more than six months, but is *also* for confinement to a penal institution where the defendant may be compelled to mingle with more hardened and older prisoners, the juvenile court "proceeding" is no more than a euphemism (a "civil label of convenience") for a criminal trial. And if it is, indeed, a substitute for a criminal trial, *Duncan* becomes more apposite than *McKeiver.*[9]

Judge J. Joseph Smith, then a District Judge, noted more than a decade ago that to permit the sending of a juvenile, subsequent to a federal juvenile proceeding, to an institution which was not for the care and custody of juveniles "would be to permit confinement for crime without a right to trial. This would be violative of the constitutional right to due process under the Fifth Amendment and to the guarantees of fair trial of the Sixth Amendment." United States ex rel. Stinnett v. Hegstrom, 178 F.Supp. 17, 20–21 (D.Conn.1959); see White v. Reid, 126 F.Supp. 867 (D.D.C.1954). Quite simply, the respondents cannot argue that denial of jury trial is offset by the protective treatment received, when the petitioner is sent to an institution which the New York courts (People v. Michael A.C., *supra*) have determined to be sufficiently penal to entitle everyone else there to the right to jury trial if he was accused of a serious crime.

Nor can the respondents fall back on the argument that the difference in treatment is justified by the juveniles' protection from the stigma of criminality. The actual benefit derived by the "unstigmatized" juvenile has been repeatedly downgraded.[10] The small benefit cannot offset the loss of an important right. Thus, in this case, the State of New York cannot point to treatment subsequent to adjudication as a legitimate validation of the informal procedures of the Family Court.

In conclusion, I believe that Murray has a valid claim, based on the denial of that fundamental fairness which had

8. Although the main ground of the decision in Gesicki v. Oswald, 336 F.Supp. 371 (S. D.N.Y.1971) *aff'd* (1972) 406 U.S. 913, 92 S.Ct. 1773, 32 L.Ed.2d 113 was that the "wayward minor" statute (N.Y.Code Crim.Proc. § 913–a(5) & (6) (1958)) was unconstitutionally vague, the overtones of the opinion by Judge Kaufman for the three-judge court embraced the conclusion that the sentence of the petitioners to penal institutions for adult criminals and "incarceration with adult criminals" (*id.* at 377 n. 7) did not meet the favor of the court. The opinion specifically noted that "there is no assurance that wayward minors will be given special treatment substantially distinguishable from that accorded to criminals . . ."; because the wayward minor statute was "substantially equivalent to a criminal statute," *McKeiver* was held not to apply (*id.* at 379).

9. The very claim of unconstitutionality here asserted was before this Court prior to the *McKeiver* decision by the Supreme Court. Respress v. Ferrara, 321 F.Supp. 675, 677 (1971) (three-judge court). At that time, Judge Friendly thought that "Plaintiff's constitutional claim is by no means unimpressive." The Court there found the claim to be premature, but the language used still points up the question of whether the decision in *McKeiver alone* makes the claim now "unimpressive."

10. Note, The Juvenile Jury Trial Case—A Regrettable "Policy Decision," 32 La.L. Rev. 133, 141 (1971); Note, Jury Trials for Juveniles: Toward a More Effective Juvenile Court System, 22 Syracuse L. Rev. 780, 786 (1971); In re Gault, 387 U.S. 1, 23–24 & n. 31, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); see McKeiver v. Pennsylvania, 403 U.S. 528, 644 n. 5, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). But see *id.* at 540, 91 S.Ct. 1976 (quoting the Court below); *id.* at 553, 91 S.Ct. 1976 (White, J., concurring).

been guaranteed to him by *In re Gault*. His claim lies within the mainstream of the juvenile due process cases, and not beyond the limit erected by *McKeiver*.

■ While the judicial duty to vindicate constitutional rights under the Great Writ cannot be abdicated, interference with State authorities is never a task eagerly accepted. Here, however, two factors reduce my reluctance to interfere. First, this decision will have an extremely limited disruptive effect. Only a very few boys are committed each year under § 758(b).[11] Second, it is a small imposition to make the authorities decide, before the proceeding begins, whether they wish to seek an Elmira commitment, in which case a right to jury trial should be respected, or whether they will settle for a commitment to a State Training School, in which case more informal procedures will suffice under *McKeiver*. Every day prosecuting authorities make the same kind of threshold decision under the six-month rule established by Baldwin v. New York; for the right to a jury trial rides on the decision of the prosecutor whether to seek a conviction which would carry a possible sentence exceeding six months.[12]

I hold, accordingly, that the petitioner was denied due process of law under the Fourteenth Amendment to the United States Constitution when he was sentenced to a term of three years and committed to Elmira Reception Center without benefit of the right to a trial by jury. In view of this decision, it is unnecessary to pass upon the equal protection argument.

The writ is granted, but it is ordered that the petitioner is to remain in custody pending further action by the State, whether that be:

1. A commitment by the Family Court to a State Training School; or

2. A motion by the State to transfer jurisdiction from the Family Court to the Supreme Court, pursuant to N.Y. Constitution, Article 6, § 19(a), or otherwise, so as to afford the petitioner a trial by jury on the issue of whether he committed the acts charged, with remand to the Family Court for ultimate disposition in accordance with the provisions of the Family Court Act.[13]

If the State does not so act within thirty days from this date, he is to be discharged from custody.

It is so ordered.

---

11. See 16 Annual Report of the Judicial Conference of the State of New York 390–91 (1970). And, of course, not all these boys will choose to exercise their right to a jury. Cf. Note, *supra*, 32 La.L.Rev. at 142.

12. Actually, this decision in a juvenile proceeding is even easier for the authorities than that required in a normal criminal prosecution under *Baldwin*, because of the extensive social investigation of the juvenile made before the proceeding takes place.

And, in fact, one State Judge has already accepted the burden of such a decision. In a case decided December 31, 1971, Judge Palmer denied a motion for jury trial; but, on the basis of reasoning similar to that in this opinion, he conditioned the denial with the ruling that "there may be no commitment to the Elmira Reception Center." In re Anthony F. (Kings Co. Family Ct., D–10906/71). See also In re Reginald S., 64 Misc.2d 1002, 317 N.Y.S.2d 180 (N.Y.Co. Fam.Ct. 1970).

13. The procedure of applying for a transfer to the Supreme Court for a jury trial in that Court has been suggested elsewhere. In re Reginald S., *supra*, 64 Misc.2d at 1007, 317 N.Y.S.2d 180. Article 6, Section 19(a) of the New York Constitution provides:

"As may be provided by law, the supreme court may transfer to itself any action or proceeding originated or pending in another court within the judicial department other than the court of claims upon a finding that such a transfer will promote the administration of justice."