UNITED STATES of America ex rel.
Robert MURRAY, Petitioner-
Appellee,

v.

Chester D. OWENS, Superintendent of
Elmira Reception Center, Elmira, New
York, et al., Respondents-Appellants.

Nos. 867, 871, Dockets 72–1474, 72–1514.

United States Court of Appeals,
Second Circuit.

Argued June 9, 1972.

Decided Aug. 10, 1972.

Michael Gage, New York City (William E. Hellerstein, New York City and Charles Schinitsky of The Legal Aid Society, Brooklyn, on the brief), for petitioner-appellee.

Robert S. Hammer, New York City (Louis J. Lefkowitz, Atty. Gen. of the State of New York and Samuel A. Hirshowitz, First Asst. Atty. Gen., on the brief), for appellants Owens and Lefkowitz.

Alfred Weinstein, New York City (J. Lee Rankin, Corp. Counsel, City of New York, Stanley Buchsbaum and Joseph I. Lauer, New York City, on the brief), for appellant Mucci.

Before FRIENDLY, Chief Judge, and LUMBARD and MULLIGAN, Circuit Judges.

LUMBARD, Circuit Judge:

This case presents the question whether it is a denial of due process to commit a 15-year-old to an adult correctional facility upon an adjudication of delinquency following fact-finding by a state Family Court judge rather than a jury. The district court held that it is, 341 F. Supp. 722, and granted the juvenile's petition for habeas corpus, ordering him released unless the state committed him to a juvenile correctional facility or granted him a new trial by jury. For the reasons stated below, we reverse.

The New York Family Court, after denying a motion for a jury trial, on March 30, 1971 found that the petitioner, then 15 years old, had on March 19, 1971 committed first degree rape and first degree robbery, acts which would constitute class B felonies if done by an

adult in New York.[1] The court adjudged the juvenile a delinquent[2] and on April 1, 1971, pursuant to § 758(b) of the New York Family Court Act, ordered him committed for three years to Elmira Reception Center, a medium security facility for males between the ages of 16 and 21 at the time of imposition of sentence.[3] Section 758(b) provides in pertinent part:

> (b) Upon an adjudication of delinquency of a person who is fifteen years of age at the time of the commission of any act which, if committed by an adult, would be a class A or a class B felony, as defined in the penal law, commitment may be for males to Elmira Reception Center . . . .

On appeal the Appellate Division of the New York Supreme Court dismissed the rape charge but otherwise affirmed the findings of the Family Court, In the matter of Robert M, 37 A.D.2d 527, 322 N.Y.S.2d 62 (1st Dept. 1971). The New York Court of Appeals denied leave to appeal, 29 N.Y.2d 484, 324 N.Y.S.2d 1030, 274 N.E.2d 313 (1971).[4] Petitioner thereupon brought a federal civil rights action which was held barred by the doctrine of res judicata, Murray v. Oswald, 333 F.Supp. 490 (S.D.N.Y. 1971). The district court suggested that habeas corpus was the proper remedy, whereupon the juvenile filed the petition leading to this appeal.

Judge Gurfein's careful opinion pointed out that in New York the Family Court has exclusive jurisdiction over children up to the age of 16, N.Y.Laws 1967, c. 680, § 87; Family Court Act §§ 712–13. Youths 16 and over are prosecuted as adults, and thus have the right to a jury trial, Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); Baldwin v. New York, 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1969). Confinement institutions are similarly bifurcated, with a signal exception. State Training Schools, administered by the Division for Youth, take juveniles under 16 and adjudicated to be juvenile delinquents by the Family Court, New York Executive Law, McKinney's Consol.Laws 18, § 510 et seq. Adults and youthful offenders[5] are committed to correctional facilities run by the Department of Correction. Elmira falls among the latter, confining youths over 16 found guilty in the adult criminal process but sentenced as youthful offenders. The exception to this scheme is, of course, § 758(b) of the Family Court Act, permitting 15-year-olds to be sent to Elmira after a non-jury adjudication in the Family Court.

■ Judge Gurfein found this latter combination of procedure and disposition a violation of due process, reasoning that the state could not justify the informality of the Family Court by the

1. New York Penal Law, McKinney's Consol.Laws, c. 40, § 130.35 (rape); *id.* § 160.15 (robbery). Petitioner was also found to have committed burglary, *id.* 140.20 et seq., possession of a dangerous weapon, *id.* 265.05, and menacing, *id.* 120.15.

2. A juvenile delinquent is defined in New York as "a person over seven and less than sixteen years of age who does any act which, if done by an adult, would constitute a crime." New York Family Court Act § 712(a).

3. 7 N.Y.C.R.R. 100.75. A "reception center" is defined as "A correctional facility for reception, classification and program-planning for purposes of confinement, treatment and transfer." New

York Correction Law, McKinney's Consol. Laws, c. 43, § 2. Petitioner points out that anyone sent to Elmira Reception Center may be transferred elsewhere within the state prison system, even to a maximum security institution, New York Correction Law § 23. That petitioner himself would be transferred, however, is mere speculation at this point. Petitioner is presently in a State Training School.

4. The New York Court of Appeals had previously dismissed an appeal as of right, 29 N.Y.2d 649, 324 N.Y.S.2d 1033, 273 N.E.2d 321 (1971).

5. See New York Criminal Procedure Law § 720.10 et seq.

treatment subsequent to adjudication when the juvenile is incarcerated under a relatively substantial sentence with more mature or non-juvenile criminals. In our opinion, this analysis runs afoul of McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).

Mr. Justice Blackmun's plurality opinion canvassed the recent Supreme Court decisions dealing with due process safeguards for juveniles.[6] He acknowledged that these cases have established that the requirements of due process must be observed in juvenile proceedings according to a standard of fundamental fairness, and that it is recognized today that the hopes for the informal and rehabilitative aspects of the juvenile system as envisaged by Judge Julian Mack and the Jane Addams School have not been realized. Nevertheless, Mr. Justice Blackmun concluded that jury trials would not strengthen the fact-finding function of the juvenile court, would therefore not remedy the perceived shortcomings of the juvenile system, and might remake the juvenile proceeding into a full adversary process and thus substantially deny the possibility that the juvenile system would achieve its goals of prompt adjudication, fairness, concern, sympathy, and paternal attention.

Judge Gurfein distinguished *McKeiver* on the ground that "The effort at *rehabilitation* . . . lay at the heart of the decision and essentially justified exclusion of the juvenile from the safeguards of *Duncan* and *Baldwin*." (Emphasis in original.) We agree that the result in *McKeiver* was heavily influenced by the juvenile system's promise of rehabilitation, but we are not persuaded that the Supreme Court would have decided differently had the issue we now face been put squarely before it. Indeed, it seems impossible to believe

that the Justices were not fully aware that juveniles are often committed to adult institutions at the outcome of delinquency adjudications. Counsel for McKeiver, arguing the necessity of jury trials to the Supreme Court, pointed out the similarities in the treatment of juveniles and adult offenders, noting, *inter alia*:

> that a juvenile detained prior to trial is held in a building substantially similar to an adult prison; that in Philadelphia juveniles over 16 are, in fact, held in the cells of a prison; . . . that, once adjudged delinquent, a juvenile may be confined until his majority in what amounts to a prison (see In re Bethea, 215 Pa.Super. 75, 76, 257 A.2d 368, 369 (1969), describing the state correctional institution at Camp Hill as a "maximum security prison for adjudged delinquents and youthful criminal offenders"); . . . 403 U.S. at 542, 91 S.Ct. at 1984.

The dissenting opinion of Mr. Justice Douglas, writing for three of the Justices, argued:

> Just as courts have sometimes confused delinquency with crime, so have law enforcement officials treated juveniles not as delinquents but as criminals. As noted in the President's Crime Commission Report:
>
> "In 1965, over 100,000 juveniles were confined in adult institutions. Presumably most of them were there because no separate juvenile detention facilities existed. Nonetheless, it is clearly undesirable that juveniles be confined with adults." President's Commission on Law Enforcement and Administration of Justice, Challenge of Crime in a Free Society 179 (1967), 403. U.S. at 560, 91 S.Ct. at 1993.

---

6. Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966); In re Gault, 387 U.S.

1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); DeBacker v. Brainard, 396 U.S. 28, 90 S.Ct. 1163, 24 L.Ed.2d 148 (1969); In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

The majority was quite familiar with the President's Crime Commission Report, citing in addition to the summary volume the actual Task Force Report: Juvenile Delinquency and Youth Crime, President's Commission on Law Enforcement and Administration of Justice. 403 U.S. at 544, 545, 546, 547, 91 S.Ct. 1976. Furthermore, prior Supreme Court decisions cited and discussed in *McKeiver* refer to the incarceration of juveniles in adult penal institutions, see Kent v. United States, 383 U.S. 541, 556, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966); In re Gault, 387 U.S. 1, 50, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) ("Indeed, in over half of the States, there is not even assurance that the juvenile will be kept in separate institutions, apart from adult 'criminals.' In those States juveniles may be placed in or transferred to adult penal institutions after having been found 'delinquent' by a juvenile court.") (footnote omitted).

We think the conclusion is inescapable that the Supreme Court in no way implied that jury trials were constitutionally required if the ultimate disposition following an adjudication of delinquency was the same as for older offenders. The Court's determination that trial by jury would not effectively improve the fact-finding process during the adjudicatory stage is not altered by whether the juvenile once adjudged a delinquent, is committed to a juvenile or an adult facility. The advantages sought by the juvenile system do not begin and end with the treatment considered appropriate once an adjudication of delinquency has been reached: they include "the idealistic prospect of an intimate, informal protective proceeding," 403 U.S. at 545, 91 S.Ct. at 1986, and, we should add, one which disposes of the issues promptly and without all the time-consuming procedures which accompany trial by jury. Furthermore, where rehabilitation is doubtful, jury trials will not speed its attainment.

In holding out hope that the juvenile court system might yet achieve a fair measure of its idealistic goals, *McKeiver* in large measure simply followed the lead of the Task Force Report, which catalogued the sad deficiencies of the system but concluded that the experiment was not beyond redemption and ought not be abandoned, see Task Force Report 9. The Task Force Report thoroughly studied the procedural aspects of the juvenile court system, and apparently considered the disadvantages attendant on a jury trial requirement to outweigh the advantages, Task Force Report 38.

Both the President's Commission in the Task Force Report and the Supreme Court in *McKeiver* emphasized the disruptive, formalizing influence the introduction of jury trials would work on the juvenile system, and neither were willing to give up entirely on the system and in effect return the juvenile to the criminal courts. The Supreme Court noted that "perhaps that ultimate disillusionment will come one day, but for the moment we are disinclined to give impetus to it." 403 U.S. at 551, 91 S.Ct. at 1989. We see no need to break ground so recently declared off limits by the Supreme Court.

Other factors which weigh against jury trials in cases such as this are the greater delay which would take place before the case was reached for trial and the much longer time consumed in trying the issues before a jury. Here Judge Timone of the Family Court found on March 30, 1971 that Robert Murray had committed numerous offenses eleven days before, on March 19. On April 1, two days later, Murray was sentenced to Elmira for a reformatory term. No complaint is made that the adjudicatory hearing was not fair or that the evidence against Murray was insufficient.

We recently took note of the mounting delays in the disposition of felony cases in the New York State Courts, United States ex rel. Frizer v. McMann, 437 F. 2d 1312 (2d Cir. 1971) (en banc). Reports from other states and metropolitan centers show that this is a nation-wide condition which is exacerbated by the

unmistakable trend to try an increasingly larger proportion of criminal cases rather than to dispose of them by pleas of guilty.[7]

It has always been considered highly desirable to dispose of juvenile charges with a minimum of delay. Were we to find jury trials required in any such cases there would be a danger that the salutory consequences of speedy disposition would be lost and that, by the time the juvenile had his case determined by a jury, he would no longer be a juvenile. In the treatment of juveniles any doubt should be resolved against requiring procedures which obviously would add considerably to the time required for adjudication.

In view of its disposition, the district court found it unnecessary to reach the argument of petitioner that the New York Family Court's failure to afford him a jury trial violates the Equal Protection Clause as well as due process. This issue has been argued by the parties on appeal and, as no facts are in dispute, it is appropriate that we resolve it.

■ Petitioner argues that § 758(b) of the New York Family Court Act arbitrarily singles out 15-year-olds for disparate treatment from all other age groups. Juveniles 14 and under cannot be sent to Elmira; youths 16 and over are afforded the right to jury trials. Only 15-year-olds can be both denied a jury trial and sent to Elmira. This amounts to invidious discrimination, petitioner alleges, prohibited by such cases as Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), Baxstrom v. Herold, 383 U.S. 107, 86 S. Ct. 760, 15 L.Ed.2d 620 (1966), and United States ex rel. Schuster v. Herold, 410 F.2d 1071 (2d Cir. 1969).

The cases cited are inapposite for the simple reason that they involved statutory distinctions drawn without regard for the purposes for which the classifications were made, while we face a three-tiered scheme which, although elaborate, cannot be said to be without reasonable relation to permissible statutory goals.

In *Skinner* the difference between crimes according to which an offender might be sterilized was held inadequate to justify the statutory assumption that "inheritability of criminal traits follows the neat legal distinctions which the law has marked." 316 U.S. at 542, 62 S.Ct. at 1113. In *Baxstrom* a denial of equal protection was found when the state statutory procedure permitted a person nearing the end of a prison term to be civilly committed without the benefit of jury review of a determination of insanity to which all other persons civilly committed were entitled. Different treatment might be justified according to whether a person was found either insane or dangerously insane, but there could be no justification for denying jury review of "whether a person is mentally ill at *all*." 383 U.S. at 111, 86 S.Ct. at 763 (emphasis in original). In *Schuster* we followed *Baxstrom* and held that the Equal Protection Clause was violated when the state allowed a prisoner to be transferred to a state institution for insane criminals without affording him the procedural safeguards available to all other persons involuntarily committed to mental institutions. We explained that *Baxstrom* meant that the procedures for determining insanity may not be influenced by the irrelevancy of a criminal conviction and imprisonment.

These cases do not support petitioner's argument that a jury trial cannot constitutionally be denied to 15-year-olds

---

7. In the federal courts the percentage of criminal cases disposed of by trial rose from 11.4% in 1961 to 17.3% in 1971. Table C–7 and D–1 of the 1961 and 1971 Annual Reports of the Administrative Office of the United States Courts. In 1961 criminal trials were 3,438 against 30,268 cases commenced; in 1971 trials were 7,456 against 43,157 cases commenced.

sent to Elmira when it is granted to 16-year-olds. The older group arrives at Elmira as a result of the adult criminal process. The 15-year-olds come through the Family Court. As indicated above, we believe that the Supreme Court in *McKeiver* countenanced the juvenile court system for the benefits it confers on juveniles apart from those arising after disposition. An informal proceeding informed by sympathy and concern was itself considered sufficiently desirable and still attainable to outweigh the argument in favor of jury trials. The juvenile system treats juvenile offenders differently from adult criminals in many ways, yet the distinctions are tolerated or encouraged in consideration of their recognition of and reasonable relation to the legitimate, different objectives of the juvenile and criminal systems. *Skinner, Baxstrom* and *Schuster* all involved classifications drawn without relevance to the goal pursued by the statutory scheme. Here we think the Supreme Court has indicated that the goals of the juvenile court system, which include benefits accruing before and during as well as after the adjudicatory proceeding, are reasonably furthered by trials without a jury.

As for the disparate treatment permitted by § 758(b) between 14-year-olds and 15-year-olds, we think that it is reasonable for the state to determine that the inclusion of criminally mature 15-year-olds with younger juvenile delinquents in the State Training Schools would have possibly adverse effects on the younger children and on the proper functioning of the State Training Schools as well. Albeit nice, the distinction is not unconstitutional; lines once drawn are ever subject to the criticism that they are arbitrary, but so long as they bear a reasonable relation to a legitimate state objective, they are permissible.

The judgment is reversed, and the district court is directed to enter an order dismissing the petition for habeas corpus.