**UNITED STATES ex rel. Lois SERO et al., Petitioners-Appellees,**

v.

**Peter PREISER et al., Respondents-Appellants.**

**No. 299, Docket 74–1944.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 11, 1974.

Decided Nov. 6, 1974.

Certiorari Denied April 14, 1975.
See 95 S.Ct. 1587.

See also D.C., 372 F.Supp. 663.

Ralph L. McMurry, New York City, (Louis J. Lefkowitz, Atty. Gen., on the brief, Samuel A. Hirshowitz, New York City, of counsel), for respondents-appellants.

Herman Schwartz, Amherst, N. Y. (Edward I. Koren, Amherst, N. Y., Elizabeth B. DuBois, Michael E. Smith, New York City, on the brief), for petitioners-appellees.

Before KAUFMAN, Chief Judge, and SMITH and TIMBERS, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

This class action presents important procedural questions regarding the present scope of what once was termed "the most celebrated writ in the English law." Blackstone, Commentaries, Bk. III, 129. It also calls upon us to decide the more pressing human problem of the proper treatment to be afforded young adults sentenced under a New York statute, subsequently repealed, to four year reformatory terms after conviction for misdemeanors for which adults receive maximum terms of one year or less. The district court, after five opinions and more than two years of litigation, granted writs of habeas corpus ordering release or resentencing of all those serving reformatory sentences under New York Penal Law Article 75. For the reasons elaborated below, we affirm in part, and remand in part.

I.

Until very recently, New York provided a special sentence of imprisonment for most young adults, aged 16 to 21, regardless of the nature of the crimes they had committed. These youths would be given terms of unspecified duration, to terminate either upon discharge on parole, or after service of four years of confinement. N.Y. Penal Law, McKinney's Consol. Laws, c. 40, §§ 75.00, 75.10 (McKinney 1967). Sentences were to be served in youth rehabilitation facilities [reformatories], which the Correction Law distinguished from state prisons. N.Y. Correction Law, McKinney's Consol. Laws, c. 43, § 314 (McKinney 1968). *See also id.* § 315. The purpose of this reformatory sentence was "to provide education, moral guidance and vocational training for young offenders," and to achieve this end the Department of Correction and the State Board of Parole employed special resources. Reformatories had special schools and shops, and parole officers working with young adult offenders had specialized caseloads. Thus, although the maximum terms that could be imposed upon adults for class A and class B misdemeanors were one year and three months respectively, N.Y. Penal Law § 70.15 (McKinney 1967), the special four year reformatory sentence was thought to be justified as a means to effect the unique rehabilitative goals envisioned for young adults. Practice Commentary to N.Y. Penal Law § 75.10 (McKinney 1967).

In 1970, the Correction Law was amended to abolish the distinction between reformatories and prisons. All institutions became correctional facilities, "used for the purpose of providing places of confinement and programs of treatment for persons in the custody of the department." N.Y. Correction Law Article 4 [§ 70(2)] (McKinney Supp. 1974–75), *replacing, inter alia,* N.Y. Correction Law Articles 3-A, 3-B, 4, 5, 12A (McKinney 1968). Thereafter, inmates serving reformatory sentences as well as other prisoners could be assigned to any of New York's correctional facilities, where the two groups would work, sleep, eat, and spend recreation time together. The statutory scheme no longer provided young adults with educational or vocational training different from that offered adult prisoners; those serving reformatory sentences also became subject to the same regulations and disciplinary sanctions as older inmates. The commendable goal was to afford young adult offenders, and indeed all prisoners, treatment in accordance with the rehabilitative aims of the New York Correction Law, *see* N.Y. Correction Law § 70(2); (McKinney Supp. 1974–75); 7 N.Y.C.R.R. § 250.2(a) (1970).

After the 1970 reform of the Correction Law, Lois Sero, Vanessa Carney, and Rita Varner, inmates of the Bedford Hills Correctional Facility, began this action under the Civil Rights Act, 42 U.S.C. § 1983 (1970), requesting the convening of a three-judge court, permission to proceed as a class action, and a declaratory judgment that the four year reformatory sentencing scheme,

N.Y. Penal Law §§ 75.00, 75.10, was unconstitutional.[1] They claimed that the challenged sections violated the equal protection clause of the Fourteenth Amendment by authorizing a term of confinement for reformatory-sentenced misdemeanants which was substantially longer than that provided for adults by N.Y. Penal Law § 70.15, since unique rehabilitative treatment was no longer provided to young adult inmates. The district court allowed the action to proceed on behalf of the class of reformatory-sentenced misdemeanants, Sero v. Oswald, 351 F.Supp. 522 (S.D.N.Y. 1972), and directed that the issue be submitted to a three-judge court, Sero v. Oswald, 355 F.Supp. 1231 (S.D.N.Y. 1973). After extensive discovery and argument of the case before the three-judge court, however, the Supreme Court decided, in Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), that a challenge to the fact or duration of confinement could not be brought under § 1983. Accordingly, the three-judge court was dissolved, and the case was remanded to Judge Lasker for disposition as a petition for habeas corpus. The district judge allowed the case to continue as a class action, United States ex rel. Sero v. Preiser, 372 F. Supp. 660 (S.D.N.Y.1974).[2]

Shortly after the petitioning class had moved for summary judgment, the four-year reformatory sentence provisions of N.Y. Penal Law Article 75 were prospectively repealed, N.Y. Laws 1974, ch. 652, § 7. The bill calling for repeal was sponsored and drafted by the Department of Corrections. A memorandum submitted by Deputy Commissioner Wil-

---

1. The inmates also attacked as unconstitutional the provisions of the N.Y. Correction Law, §§ 803, 804 (McKinney 1968) granting good behavior allowances only to those offenders serving indeterminate and definite sentences. This claim has been rendered moot by the enactment of N.Y.L.1974, chs. 652, 653, retroactively granting such time off to members of the petitioning class.

In addition, the class claimed a violation of due process in New York's failure to pro-

vide a hearing on reformability before the imposition of a reformatory sentence. Because of the disposition it reached on the equal protection claim, the district court found it unnecessary to rule on this issue.

2. Judge Lasker also permitted the class to proceed *simultaneously* with *its* declaratory judgment claim under § 1983.

liam C. Donnino to the State Assembly explained its purpose:

This bill is a logical culmination of the restructuring of the State correctional system which was commenced by the legislature in 1970 when it created the Department of Correctional Services and abolished the distinction between reformatories and State prisons.

As provided by the 1970 legislation, Article 4 of the Correction Law mandates that every institution operated by the Department of Correctional Services for the confinement of inmates . . . shall be a correctional facility maintained for the purpose of providing places of confinement and treatment with the objective of assisting inmates to live as law abiding citizens. Correctional facilities are classified by functions, such as residential treatment facilities, general confinement facilities and work release facilities. Individuals, regardless of the type of sentence they are serving, are confined in institutions best suited to their needs. For purposes of confinement, treatment, education and vocational training, persons serving reformatory or indeterminate sentences are treated in accordance with rehabilitative goals rather than the type of sentence they are serving. Since reformatories as well as the special purposes they historically served no longer exist, there is no longer a need for reformatory sentences.

Moreover, the sentence is unfair in that it treats young adults . . . more harshly than adults.

This memorandum was submitted on the motion for summary judgment, and upon this and other grounds, Judge Lasker granted writs of habeas corpus to the class. United States ex rel. Sero v. Preiser, 377 F.Supp. 463 (S.D.N.Y.1974).[3] He found that, although longer sentences could, under some circumstances, be imposed on young offenders without violating the Constitution, New York's extended detention of the petitioning class ran afoul of the equal protection clause. He reasoned that since the treatment received by young adults, as well as all other conditions of custody, were the same as those afforded adult misdemeanants, any basis for longer periods of incarceration had disappeared. Thus, the court ordered the unconditional discharge of those who had already served adult-length terms, and provided for resentencing within thirty days of those who had not.[4] Thereafter, this court denied a stay of the order of release but granted the respondents' motion for an expedited appeal. We required, however, that those discharged report their addresses monthly to the releasing institution or parole office. By September 3, 1974, more than 500 members of the class had either been freed from correctional facilities or parole, or were in the process of being resentenced.

II.

Although this case presents a number of difficult procedural problems, resolution of several of those questions will be assisted by a more exact understanding of the nature of the petitioners'

---

3. We find unpersuasive respondents' argument, raised for the first time on appeal, that the district court improperly considered Donnino's statement in granting summary judgment and the writs requested. The answer to the petitioners' Statement of Substantial Undisputed Facts submitted on the motion for summary judgment admitted that, in making the statement to the Assembly, Donnino had acted as the agent of the Commissioner of Corrections.

4. The district court also granted summary judgment on the § 1983 claim, declaring Arti-

cle 75 unconstitutional to the extent that it authorized the imposition of extended sentences on members of the class. Because of our conclusion on the habeas corpus claims of the reformatory-sentenced inmates, we need not consider whether such a declaratory judgment would be permitted under Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

substantive claim. Consequently we shall turn directly to the merits of the constitutional issue. The circumstances upon which the class relies in charging a denial of equal protection are relatively uncomplicated. Although the four-year reformatory sentence provisions of New York Penal Law Article 75 were prospectively repealed this year, each member of the class was sentenced under that Article to a term substantially in excess of the adult penalty for the same misdemeanor. And while prior to the 1970 reform of the Correction Law these extended sentences would have been served in reformatories, the petitioners claim that the treatment they now receive, as well as all 'other conditions of their custody, are identical to those afforded adult misdemeanants. It is the combination of these two factors to which they point as a deprivation of their fourteenth amendment rights.

■ We state preliminarily that neither of the conditions relied upon, considered separately, would entitle the class to the relief it seeks. The claim that longer periods of confinement may not constitutionally be imposed on young offenders has been frequently raised under the parallel provision of the Federal Youth Corrections Act, 18 U.S.C. § 5010 (1970), and uniformly rejected. *See, e. g.,* Caldwell v. United States, 435 F.2d 1079 (10th Cir. 1970); Abernathy v. United States, 418 F.2d 288 (5th Cir. 1969); United States v. Rehfield, 416 F.2d 273 (9th Cir. 1969), cert. denied, 397 U.S. 996, 90 S.Ct. 1137, 25 L.Ed.2d 405 (1970); United States v. Dancis, 406 F.2d 729 (2d Cir.), cert. denied, 394 U.S. 1019, 89 S.Ct. 1640, 23 L.Ed.2d 44 (1969); Carter v. United States, 113 U.S.App.D.C. 123, 306 F.2d 283 (1962). The justification for this was best stated by Chief Justice [then Judge] Burger:

[T]he basic theory of that Act is rehabilitative and in a sense this rehabilitation may be regarded as comprising the *quid pro quo* for a longer confinement but under different conditions and terms than a defendant would undergo in an ordinary prison.

Carter v. United States, *supra*, 306 F.2d at 285. Nor is it necessary in this case to decide whether it is permissible or wise to confine youths in the same facility with adult offenders. Recently we upheld against an equal protection challenge the procedures by which juveniles were adjudicated delinquent under the New York Family Court Act, and committed to institutions also housing inmates prosecuted as adults. United States ex rel. Murray v. Owens, 465 F.2d 289 (2d Cir. 1972), cert. denied, 409 U.S. 1117, 93 S.Ct. 930, 34 L.Ed.2d 701 (1973). *See also* Sonnenberg v. Markley, 289 F.2d 126 (7th Cir. 1961), allowing the confinement in a federal penitentiary of youths convicted under the Federal Juvenile Delinquency Act, 18 U.S.C. § 5031 et seq. (1970).[5] We are, consequently, presented with two questions on this appeal: whether there is any basis in fact for disputing the claim that these young adult misdemeanants are given identical treatment under the same conditions as adults who have committed the same offenses; and whether the combination of this circumstance with the extended reformatory sentence for young adults only, amounts to a denial of equal protection. We conclude that it does.

### THE CONDITIONS OF CONFINEMENT

The proper response to the respondents' claim that reformatory-sentenced inmates are in fact confined under conditions different from those imposed on adults can best be formulated by

---

5. It is interesting to note, however, that the act also provides: "Such commitment shall not exceed the term which might have been imposed had he been tried and convicted of the alleged violation." 18 U.S.C. § 5034

(1970). *See also* Harvin v. United States, 144 U.S.App.D.C. 199, 445 F.2d 675 (en banc) (interpreting parallel provision of the Youth Corrections Act), cert. denied, 404 U.S. 943, 92 S.Ct. 292, 30 L.Ed.2d 257 (1971).

projecting the treatment of these petitioners against the background of the New York Correction Law and its elaboration in the Correctional Department's Rules and Regulations, 7 N.Y.C.R.R. (1974). Not only does the Correction Law fail to give special treatment of any sort for young adult offenders, but the implementation of the departmental rules explicitly providing for confinement under identical conditions of both adult prisoners and those serving reformatory-length terms demonstrates that there is little merit to any claim that, despite the statutorily authorized treatment, there is a de facto segregation of young adults from older inmates.

The facilities established by the recent restructuring of the Correction Law are classified in several ways. Because the institutions within the department must be maintained with due regard for the safety of the community and of those ~ in custody, the law provides for maximum, medium, and minimum security prisons. N.Y. Correction Law § 70(6) (a) (McKinney Supp. 1974–75). Regardless of security classification, facilities are also designed to serve one or several of seven functions. *Id.* § 70(6) (b). Three of these uses—as reception, detention, and diagnostic and treatment centers—are only of a transitory nature, since transfer may be effected once the contemplated temporary end has been served. *See id.* § 2(5), (7), (9). The remaining four—residential treatment facilities, correctional camps, general confinement facilities, and work-release facilities—are the heart of the correctional system. In different ways, they are intended to effect the ends for which custody is imposed. Obviously, each confines the inmates for purposes of punishment, deterrence, and isolation from the community to which they might occasion danger. N.Y. Penal Law § 1.05 (4, 5) (McKinney 1967). Each is also intended to rehabilitate the offender. *Id.* § 1.05(5). Thus the general confinement facilities aim at "treatment of persons under institutional programs oriented to education, vocational training and industry;" N.Y. Correctional Law § 2(10) (McKinney Supp. 1974–75); correctional camps are "maintained for the purpose of including conservation work in the program of inmates." *Id.* § 2(8). Residential treatment facilities allow inmates "to go outside the facility during reasonable and necessary hours to engage in any activity reasonably related to [their] rehabilitation," which may include on-the-job training and employment. *Id.* § 73 (1), (2). Work-release facilities may conduct work-release programs to achieve the same goal. *Id.* § 2(11).

The statute also provides another method of classification: departmental regulations must specify the age and sex of persons who may be confined at any of the different institutions. *Id.* § 70(5). No indication is given, however, that the division according to age should parallel the distinction elsewhere made by length of sentence between adults and young adults between the ages of 16 and 21.

Respondents contend that the failure of the Correction Law specifically to provide unique treatment for the class of young adults is not fatal, since the Department of Corrections has implemented that Law in order to confine almost all the class members in institutions reserved for offenders of similar age. More particularly, they claim that 90% of reformatory-sentenced misdemeanants are sent to the Elmira Correctional Facility, the Coxsackie Correctional Facility, or one of the camps under the jurisdiction of the Department. An examination of the departmental regulations makes clear, however, that even within those institutions youths between 16 and 21 are confined indiscriminately with adult offenders, although they must serve longer terms for identical crimes.

Pursuant to the statutory mandate, N.Y. Correction Law § 70(5) (McKinney Supp. 1974–75), that correctional facilities be classified according to the

criteria discussed above, the Department of Corrections promulgated its Designation and Classification of Correctional Facilities, 7 N.Y.C.R.R. Subchapter A (1974). Respecting the institutions in which respondents claim most reformatory-sentenced inmates are confined, those provisions state:

100.35 . . . The Elmira Correctional and Reception Center shall be classified as a medium security facility to be used for the following functions:

.  .  .  .  .  .

(b) General confinement facility for males between the ages of 18 and 30; provided, however, that males between the ages of 16 and 18 and males older than 30 may be placed therein for general confinement purposes in accordance with Part 100 [sic] of this Chapter; and

.  .  .  .  .  .

(d) Work release facility for eligible inmates.

*  *  *  *  *  *

100.45 . . . (b) [The Coxsackie Correctional Facility] shall be a correctional facility for males between the ages of 16 and 21; provided, however, that males over the age of 21 may be placed. therein for general confinement purposes in accordance with Part 150 of this Chapter.

(c) Coxsackie Correctional Facility shall be classified as a medium security correctional facility to be used for the following functions:

General confinement facility . . .

*  *  *  *  *  *

100.65 . . . (a) There shall be in the department four [correctional camps]. . . .

(b) Such institutions shall be correctional facilities for males between the ages of 16 and 25.

(c) [The four camps] shall be classified as minimum security correctional facilities to be used for the function of correctional camps.

Part 150, referred to in connection with the Elmira and Coxsackie Correctional Facilities, provides:

150.1 . . .

(a) The age ranges set forth in this Chapter are basically indicators of inmate maturity level. In any case where an inmate is not within the age range specified for an institution, such inmate may nevertheless be confined therein upon specific written approval of the commissioner or of a deputy commissioner if:

(1) There are reasonable grounds to believe that such person fits in with the maturity level indicated by the age range specified for that institution; or

(2) Said institution offers a special program that can be of substantial benefit to the health, care or rehabilitation of the inmate.

We also note that Bedford Hills, the institution in which all representatives of the class are confined, is presently the only state prison for women. As to it the provisions state:

100.80

.  .  .  .  .  .

(b) Such institution shall be a correctional facility for females 16 years of age or older.

(c) Bedford Hills . . . shall be classified as a medium security correctional facility to be used for the following functions:

(1) General Confinement facility;

.  .  .  .  .  .

(4) Work release facility for eligible inmates.

Several obvious conclusions emerge from this brief review of the departmental regulations. Most significant is that, with the exception of Coxsackie, there is no institution in which young adult misdemeanants may not be mixed without distinction among older offenders. Moreover, even at Coxsackie Part 150 allows the detention of misdemeanants above the age of 21 who either may

benefit from the program there, or are found to be at a level of maturity similar to the younger prisoners.[6] Finally, we emphasized the admitted fact that there is no segregation of adults from young adults within the various facilities where the members of the class are confined. In each institution listed in response to the petitioners' Request for Admissions, reformatory-sentenced inmates are commingled with adults at work, in sleeping quarters, and in the mess hall. Nor are the petitioners provided separate recreational facilities, educational programs, vocational training, counselling, drug addiction, or other programs. All inmates, regardless of the type of sentence being served, are subject to the same rules and disciplinary sanctions and enjoy the same privileges.

Perhaps even more significant than the integration of class members with adult criminals at the institutions mentioned, though, is the fact that no young adult can be assured that he will remain in—or indeed that he will be initially sent to—one of those facilities. The Rules and Regulations provide, for example, that each of the maximum security prisons can be used as a detention center for those 16 and older, and as a general confinement facility for members of the petitioning class in accordance with the provisions of Part 150. 7 N.Y.C.R.R. §§ 100.5 (Attica), 100.10 (Auburn), 100.15 (Clinton), 100.20 (Green Haven), 100.25 (Ossining). Similar regulations apply to the other medium and minimum security institutions, 7 N.Y.C.R.R. §§ 100.27–100.94, most of which allow general confinement of young adults even without the approval required by Part 150. Nor is

the likelihood of imprisonment in one of these facilities an empty threat. The Deputy Commissioner for Program Services in the Department of Correctional Services stated that 10% of those initially sent to Elmira, Coxsackie, or the correctional camps would be transferred after a determination that "the best interest of such inmate[s] requires a program with stronger custodial emphasis." Finally, we find it difficult to credit to any firm departmental policy even the alleged present distribution of class members among the available facilities. For the only detailed survey—made by the Department's Bureau of Research Statistics—of the places of confinement of misdemeanants serving reformatory sentences demonstrated that as of December 31, 1971, more than half of the 316 such offenders were in facilities other than those mentioned by the Deputy Commissioner. Seventy-eight young adults were confined in maximum security prisons like Attica, Clinton and Green Haven, and only 22 were in the four correctional camps.

## THE REHABILITATIVE *Quid Pro Quo*

What we have said thus far leads us to the conclusion that there can be no rational support for the respondents' final argument. Their contention is

> that the *quid pro quo* of the extended reformatory sentence is rehabilitative treatment, and it is essentially irrelevant that a program of rehabilitation fitted to the needs of an individual inmate is either shared by other inmates or that a custodial regime suitable to the reformatory sentenced inmates may also be suitable for other inmates, or that reformatory sen-

---

6. We emphasize that the integration of adults and young offenders provided for by the department's rules is carried out in practice. The affidavit (dated May 10, 1974) of Edward Elwin, Deputy Commissioner for Program Services in the Department of Correctional Services, admits that the Elmira, Coxsackie, and correctional camp facilities "are *basically* established and operated for the rehabilitation of young offenders. Although *individuals up to 30 years of age might be*

*placed in Elmira*, the other facilities are *primarily* for individuals 21 years of age or younger." [Emphasis supplied.] As 7 N.Y. C.R.R. § 100.65 makes evident, the correctional camps are used for the detention of those between the ages of 16 and 25. And some idea of the frequency with which Part 150 is used at the Coxsackie Correctional Facility may be gathered from the fact that, as of December 31, 1971, 13% of those confined there were serving indeterminate sentences.

tenced inmates are not segregated from other inmates.

It is, of course, commendable that New York attempts to rehabilitate all convicted misdemeanants sentenced to terms of imprisonment. It is also praiseworthy that the state has tried to gear the various facilities within the jurisdiction of the Department of Corrections to achieve this end in a way which takes account of maturity, need, and the inmate's willingness to change. And yet to uphold the provisions of Article 75 would mean that one sentenced pursuant to it could be confined for four years in the same institution, under identical conditions, and with exactly the same rehabilitative program as an adult whose term could not under the law exceed three months to one year.

Respondents attempt to justify the extended confinement of young offenders by arguing that the class also receives the benefit of a correspondingly longer rehabilitative program. We are unable to follow this sleight of hand. We do not deny that, where the conditions of detention cannot be characterized as punitive, such an argument has some force. In such instances an extended sentence afford youthful offenders "not heavier penalties and punishment than are imposed upon adult offenders, but the opportunity to escape from the physical and psychological shocks and traumas attendant upon serving an ordinary penal sentence while obtaining the benefits of corrective treatment, looking to . . . social redemption and restoration." Cunningham v. United States, 256 F.2d 467, 472 (5th Cir. 1958).

Such was in fact the situation under the pre-1970 law applicable to young adult offenders. As the Practice Commentary to Section 75.10—written by the present Commissioner of Corrections, Peter Preiser—stated: the "law did not recognize any distinction based upon type of offense in dealing with . . . convicted young offenders. The four-year period . . . provided was selected as a reasonable and meaningful period for the [rehabilitative] purposes" of the statute. Rather than serving punitive ends, the law sought to offer every young misdemeanant "education, moral guidance and vocational training" through the "specialized and concentrated resources" provided by the reformatories in which all were confined. Practice Commentary, *supra.*

But as is the practice elsewhere, New York has consistently recognized that its other penal institutions serve purposes in addition to rehabilitation. Explicit reference is made to the fact that confinement in those prisons serves the ends of punishment, isolation, and deterrence, N.Y. Penal Law § 1.05(4, 5) (McKinney 1967).[7] For precisely that reason, adult sentences have been tailored to the gravity of the offense—not to the individual's need for or amenability to rehabilitation. *Id.* at § 1.05(4). With the repeal of N.Y. Penal Law Article 75 (McKinney 1967), repealed, N.Y.Laws 1974, ch. 652, § 7, the state acknowledged the necessity of employing a similar limiting principle in sentencing young adults who, since 1970, have been confined in the same correctional facilities as adults.

Thus the present penal and correctional scheme leaves the class of reformatory-sentenced misdemeanants in the anomalous position of serving extended terms when "reformatories as well as the special purposes they historically served no longer exist . . . ." They are, it is true, given rehabilitative treatment; but they are subject as well to the same punitive, deterrent, and isolating conditions as adult prisoners for substantially longer periods of time, and for this treatment we are unable to find any *quid pro quo.*

---

7. Indeed, it has been more than once suggested that the prisons of our country have not been rehabilitating prisoners. *See, e. g.,* W. Amos, The Philosophy of Corrections: Revisited, 38 Federal Probation 43, 45 (1974); I. Kaufman, Prison: The Judge's Dilemma, 41 Fordham L.Rev. 495, 499–503 (1973); Hearings before the Sen. Jud. Comm. on Juvenile Delinquency, 91st Cong., 1st Sess., 5194 (1971).

### III.

Having examined the merits of the petitioners' claims, we must still consider several vexing procedural issues: whether this habeas corpus proceeding is maintainable as a class action; whether, in light of 28 U.S.C. § 2241(d) (1970), the class may appropriately embrace all young adult misdemeanants held in custody by the state of New York, or must instead be limited to those in custody or convicted and sentenced in the Southern District of New York, where the action below was brought; and, finally, what action may be deemed to satisfy the exhaustion requirements upon which federal collateral relief to state prisoners is conditioned. For the reasons stated below, we find that the class was properly allowed to proceed as defined by the district court.

### CLASS ACTION

Although habeas corpus proceedings are referred to as "civil proceedings," the Federal Rules of Civil Procedure are applicable only "to the extent that the practice in such proceedings is not set forth in statutes of the United States and has heretofore conformed to the practice in civil actions." Fed.R.Civ.P. 81(a)(2). The relevant statutory provisions, 28 U.S.C. § 2241 et seq. (1970), offer little help when the petitioners are numerous. Moreover, the "conformity" provision of Rule 81 has been interpreted by the Supreme Court to dictate explicit applicability of the Rules only in those areas of habeas practice which prior to the enactment of the Rules had utilized the modes of civil practice. Harris v. Nelson, 394 U.S. 286, 294, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969). Relying upon the significant expansion of the discovery provisions in the 1938 Rules, as well as the burden which their full implementation would impose upon prison officials, the Harris Court decided that the conformity clause did not permit use of Rule 33 interrogatories in habeas actions. Similar considerations impel us to conclude that the class action device should not be imported into collateral actions, at least in its full vigor as contemplated by Rule 23. Like Rule 33 discovery, even the original and more restrictive version of Rule 23 which was adopted by the Rules' Enabling Act represented a rather "bold attempt" to encourage class actions, a form of relief traditionally confined to equity practice. C. Wright, Law of Federal Courts, § 72 at 306 (2d ed. 1970); Advisory Committee Notes, Fed.R.Civ.P. 23. There is little evidence, moreover, that even the narrower pre-1938 multi-party proceedings enjoyed any considerable application in habeas corpus actions. Note, Multiparty Federal Habeas Corpus, 81 Harv.L.Rev. 1482, 1493 (1968). Finally, we would hesitate to impose on judicial and correctional officials, by approving full employment of Rule 23, the very substantial burdens of discovery and proof which would be required to rebut even the most frivolous allegations— made "generally without the guidance or restraint of members of the bar," Harris, supra, at 297, 89 S.Ct. at 1089— that an inmate's complaint involved predominant questions of law or fact applicable to numerous other prisoners.

To say that the precise provisions of Rule 23 do not apply to habeas corpus proceedings, however, is toto caelo different from asserting that we do not have authority to fashion expeditious methods of procedure in a specific case. Harris confirms the power of the judiciary, under the All Writs Act, 28 U.S.C. § 1651 (1970), to fashion for habeas actions "appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage." 394 U.S. at 299, 89 S.Ct. at 1090. We find in the unusual circumstances of this case a compelling justification for allowing a multi-party proceeding similar to the class action authorized by the Rules of Civil Procedure. Our conclusion is based in large measure upon the nature of the claim here presented by Sero and the other young adult misdemeanants whom she would represent. As the discussion of that claim in the preceding section made clear, the charge

that the four-year reformatory sentence violates equal protection is applicable on behalf of the entire class, uncluttered by subsidiary issues. Since the 1970 restructuring of the correctional system the treatment which young adults 'have received, as well as all other conditions of custody, have been identical to those afforded adult misdemeanants.

█ A number of other persuasive justifications enforce our conclusion that the class action device was appropriately used in this case. Because many of those serving reformatory sentences are likely to be illiterate or poorly educated, and since most would not have the benefit of counsel to prepare habeas corpus petitions, it is not improbable that more than a few would otherwise never receive the relief here sought on their behalf. *See* Developments in the Law—Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1170–71 (1970); Adderly v. Wainwright, 58 F.R.D. 389, 405 (M.D.Fla.1972). Considerations of economy also argue persuasively for such a result. The considerable expenditure of judicial time and energy in hearing and deciding numerous individual petitions presenting the identical issue is thereby avoided, Williams v. Richardson, 481 F.2d 358, 361 (8th Cir. 1973), as is the expense which would be incurred in appointing counsel for each individual who proceeded on his own.[8]

Although we trust it is clear that the precise provisions of Rule 23 are not applicable to these proceedings, our conclusion that an analogous procedure may be employed in this case is bolstered by the Federal Rules' delineation of the circumstances which make multi-party actions appropriate. Four prerequisites to a class action are specified by Fed.R. Civ.P. 23(a): (1) the class must be so numerous that joinder of all members is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims of the representative parties must be typical of those made by the class; and (4) it must be shown that the representative parties will fairly and adequately protect the interests of the class. There is no question but that joinder in this case would have been impracticable, if not impossible. The more than 500 members of the class—many of them unidentifiable at the time the action was commenced—far surpass the requirements of numerousness which have been imposed in more straightforward civil actions. *See, e. g.,* Cypress v. Newport News Gen. & Nonsectarian Hosp. Assn., 375 F.2d 648, 653 (4th

---

8. In finding class treatment appropriate we do not ignore two further peculiarities of the statutory provisions applicable to habeas corpus proceedings. It is true that, although two earlier versions of the Great Writ were phrased in the plural, Act of Aug. 29, 1842, ch. 257, 5 Stat. 539; Act of Mar. 2, 1833, ch. 57, § 7, 4 Stat. 634, the present Code speaks only in the singular, *see, e. g.,* 28 U.S.C. § 2241 (1970). It seems clear, however, that the change was intended to be more stylistic than substantive, and the courts have frequently entertained joint applications by petitioners convicted at a joint trial. *See, e. g.,* United States ex rel. Poret v. Sigler, 361 U.S. 375, 80 S.Ct. 404, 4 L.Ed.2d 380 (1960); Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923); United States ex rel. Kozicky v. Fay, 248 F.2d 520 (2d Cir. 1957), cert. denied, 356 U.S. 960, 78 S.Ct. 997, 2 L. Ed.2d 1067 (1958).

A less frivolous objection to issuance of the writ on behalf of a large class is that 28 U.S.C. § 2242 (1970) requires that an "[a]pplication . . . be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf." We find here, however, convincing reasons for holding that the application for the petitioners—all between the ages of 16 and 21 at conviction—has been executed by "someone acting in [their] behalf." This court has recognized for more than half a century that "[t]here are many instances and circumstances under which it may not be possible nor feasible that the detained person shall sign and verify the complaint. Inability to understand the English language or the situation . . . ., impossibility of access to the person, or mental incapacity are all illustrations of a proper use of the 'next friend' application." United States ex rel. Bryant v. Houston, 273 F. 915, 916 (2d Cir. 1921). It would seem appropriate to recognize that the age and competence of most members of the class make it unlikely that they would avail themselves of the relief here sought on their behalf.

Cir. 1967) (eighteen); Citizens Banking Co. v. Monticello State Bank, 143 F.2d 261, 264 (8th Cir. 1944) (forty). And although we believe that more stringent standards may be appropriate in deciding whether a habeas action presents substantial and common questions of law or fact, it is apparent that the complaint of the representative parties in this suit states a clear and unitary allegation on behalf of all young adult misdemeanants. *Cf.* Gesicki v. Oswald, 336 F.Supp. 371 (S.D.N.Y.1971), aff'd, 406 U.S. 913, 92 S.Ct. 1773, 32 L.Ed.2d 113 (1972). Although we are informed that the facilities at Bedford Hills differ from those at many of the other state correctional institutions, that factor is irrelevant to our purposes. This is so because the petitioners do not charge that the state has failed to confine them in the existing institutions best suited to their needs, but that an unconstitutional distinction is made among inmates of each institution—all receiving the same treatment—solely by reason of age. Finally, we find it clear that the representative parties have fairly and adequately protected the interests of the class. The district court found, and we agree, that the parties have been represented throughout by conscientious and experienced counsel, 351 F.Supp. at 528, and they have vigorously prosecuted the claim on behalf of the other members.[9]

### SECTION 2241(d)

Even if this action may be appropriately maintained as a class action, the respondents claim that the district court did not have jurisdiction over all the members of the class to whom its decree would extend. Although all the representative petitioners were, at the time this action was begun, confined at the Bedford Hills Correctional Facility, we are told that some members of the class were neither confined nor convicted within the Southern District of New York. Therefore, the argument concludes, the district court was deprived of jurisdiction as to these persons by 28 U.S.C. § 2241(d) (1970), which provides:

> Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him . . . .

A proper understanding of § 2241(d) requires a brief elucidation of its relationship to § 2241(a).

The general grant of habeas corpus jurisdiction has long provided that the Supreme Court, any of its justices, any circuit judge, or any district court could grant the writ "within their respective jurisdictions." 28 U.S.C. § 2241(a) (1970), *formerly* 28 U.S.C. § 452 (1940). *See* Act of Feb. 13, 1925, ch. 229, § 6, 43 Stat. 940; Rev.Stat. § 752; Act of Feb. 5, 1867, ch. 28, 14 Stat. 385. In 1948 that provision was interpreted to mean that a district court lacked subject matter jurisdiction to grant the writ on behalf of a prisoner who was not confined within its territorial bound-

---

9. What we have said, *supra*, concerning the nature of the claim made by all members of the class confirms our view that this action is at least as appropriate for class treatment as those to which the further provisions of Rule 23 would apply. It is clear that subsection 23(b) states conditions in addition to those set out in the first subsection of the rule, since it defines the nature of claims most appropriately entertained in a unitary proceeding. But the situation before us is strongly analogous to the (b)(2) class action, in which "the party opposing the class has acted or refused to act on grounds generally applicable to the class . . . ." Fed.R.Civ. P. 23(b)(2). Further, a decision on the constitutionality of detention under Article 75 would, as a practical matter, most likely be dispositive of the interests of the other members not parties to the adjudication. *Cf.* Atlantis Dev. Corp. v. United States, 379 F.2d 818, 826–829 (5th Cir. 1967); Nuesse v. Camp, 128 U.S.App.D.C. 172, 385 F.2d 694, 701–702 (1967).

aries. Ahrens v. Clark, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948). It rapidly became apparent, however, that *Ahrens* was a self-inflicted judicial wound. The court nearest the place of confinement was, perhaps more often than not, by no means the most convenient forum for resolution of the dispute raised by a habeas petition. All the material events would usually have taken place, and all the records and witnesses were generally to be found, near the court which had originally imposed the confinement. Moreover, restriction of jurisdiction to the locus of confinement had the singular disadvantage of imposing on those district courts near detention facilities the burden of entertaining all collateral actions brought by inmates in those prisons. In an effort to rescue the courts from a calamity of their own making, Congress in 1966 enacted § 2241(d), which specified that a habeas corpus petition could also be filed in the federal district in which the court which had entered judgment and sentence was located. *See* S. Rep. No. 1502, 89th Cong., 2d Sess. (1966); H. R. Rep. No. 1894, 89th Cong., 2d Sess. (1966).

Helpful though it was, the remedy was not complete enough to undo the damage done by *Ahrens's* narrow jurisdictional interpretation of § 2241(a). The inadequacy was most convincingly demonstrated by the problem of interstate detainer. In Braden v. 30th Judicial Circuit Court of Ky., 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973), an inmate confined in an Alabama state prison after a felony conviction applied for habeas corpus relief in the Federal District Court for the Western District of Kentucky, seeking to attack a pending Kentucky indictment. Relying in large measure upon the liberalization of intrastate habeas effected by § 2241(d), as well as the post-*Ahrens* provision of 28 U.S.C. § 2243 (presence of petitioner not required when application presents only issues of law), the Court held that:

So long as the custodian can be reached by service of process, the court can issue a writ "within its jurisdiction" [for purposes of § 2241 (a)] . . ., even if the prisoner himself is confined outside the court's territorial jurisdiction.

410 U.S. at 495, 93 S.Ct. at 1130. With respect to Braden's claim the state of Kentucky was the real custodian, since for purposes of the detainer pursuant to the pending indictment the Alabama correctional officials acted only as agents. Thus the federal district court in Kentucky had jurisdiction to issue the writ.

■ This straightforward reading of § 2241(a), as the Court certainly realized, was not without its effect upon the interpretation to be given § 2241(d). If the original jurisdictional grant in § 2241(a) was to be construed as coextensive with the scope of service of process, *see* Fed.R.Civ.P. 4(f), then a jurisdictional reading of § 2241(d) would render that subsection merely repetitious. The *Braden* Court recognized, further, that the 1966 amendment was motivated, at least in part, by "a desire to insure that the disputes could be resolved in the most convenient forum," 410 U.S. at 497 n. 13, 93 S.Ct. at 1131, i. e. by considerations traditionally proper to venue. We think it clear, from both the Court's language and the language of § 2241(d), that it makes more sense to read this section as a provision fixing venue and aimed at problems of judicial administration whose solution lies in the balance of convenience among various courts. *Cf.* 83 Harv.L.Rev. at 1161–65.

■ Before proceeding to a discussion of the venue requirements for this class action, however, we feel constrained to indicate that we need not rest our decision that the district court had jurisdiction over the entire class upon our interpretation of § 2241(d). For even if—contrary to the clear implication of *Braden*—that section is to be read as jurisdictional, we find compel-

ling reasons for concluding that Congress did not intend the section to preclude determination in one forum of multi-party actions. The parallel practice in Rule 23 class actions provides a basis for our decision. Although the statutory grant of diversity jurisdiction, 28 U.S.C. § 1332 (1970), has from its inception been interpreted to require complete diversity among opposing parties, Strawbridge v. Curtiss, 7 U.S. [3 Cranch] 267, 2 L.Ed. 435 (1806), it is almost equally well-settled that a class action may satisfy § 1332 if there is diversity only between the representative plaintiffs and the defendants. Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921). The distinction is not difficult to fathom. Limitation of the class in order to achieve diversity would also

> result in the determination of the rights of most of the class by a decree rendered upon a theory which may be repudiated in another forum as to a part of the same class.
>
> . . . If the decree is to be effective and conflicting judgments are to be avoided, all of the class must be concluded by the decree.

*Id.* at 366–367, 41 S.Ct. at 342. Similar considerations argue persuasively for a like interpretation of § 2241(d), if, indeed, it is to be read as jurisdictional. The interests of judicial economy, the need for fairness among prisoners similarly situated, and the desirability of certainty in the law, all demand a con-

clusion that will not deal with only some members of the petitioning class, while it leaves others open to the possibility of contrary result in another court.[10] Since the representatives of the class in this case—all inmates at the Bedford Hill Correctional Facility—could properly have proceeded individually in the court below, we find that Judge Lasker correctly concluded that he had jurisdiction over the entire class.

■ Whether venue in the Southern District of New York was proper as to all class members is a question which need not detain us. The practice in Rule 23 class actions once again furnishes a guide to our decision. Although the same statutory provisions determine venue for Rule 23 as for non-class actions, 28 U.S.C. § 1391(a) (1970) (diversity actions may be brought only in the district where all plaintiffs or all defendants reside, or in which the claim arose) may be satisfied if only the named parties to a class action meet its requirements. 3B Moore's Federal Practice ¶ 23.96 (1974); C. Wright, Law of Federal Courts § 72, at 315 (2d ed. 1970). *See* Dale Electronics, Inc. v. R.C.L. Electronics, Inc., 53 F.R.D. 531, 538 (D.N.H.1971); Research Corp. v. Pfister Assoc. Growers, Inc., 301 F. Supp. 497, 501 (N.D.Ill.1969). Here too, the rationale is not difficult to comprehend. The same need for consistency, fairness and economy which dictated a common-sense construction of the jurisdictional provisions applies as well to those determining venue.

10. We are mindful of the Supreme Court's recent ruling affording stricter enforcement to the jurisdictional provisions defining "amount in controversy," 28 U.S.C. § 1332 (1970). Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). *See also* Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). These decisions, however, rested in large measure on the need to protect the jurisdictional limitation against expansion by aggregation of claims, 394 U.S. at 339–340, 89 S. Ct. 1053, or by allowing " 'one plaintiff [to] . . . ride in on another's coattails.' " 414 U.S. at 301, 94 S.Ct. at 512. This considera-

tion is irrelevant to the present action. We do not have before us a case where the class action device would admit into the federal court petitioners who otherwise would be unable to meet jurisdictional requirements, since each member could proceed independently in the jurisdiction of his confinement or conviction. A reading of § 2241(d) consistent with *Supreme Tribe of Ben-Hur* not only avoids the undesirable inconsistencies upon which that decision turned, but also has the advantage of reducing litigation which could otherwise go forward only in numerous individual actions.

■ It is clear to us that the representative petitioners satisfy the habeas corpus venue requirements, whether they are to be defined by § 2241(d) or otherwise.[11] Each named petitioner was confined in the district in which the action was brought. Moreover, little added inconvenience was imposed upon the respondents by requiring them to defend against the other class members' claims, which were identical to those of the representative parties.

## EXHAUSTION

The requirement that a state prisoner must first exhaust all state remedies before proceeding with a collateral attack in the federal court is set forth in 28 U.S.C. § 2254(b). The exceptions to this rule are instances where "there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." *Id.* It is clear that two of the named plaintiffs, Lois Sero and Rita Varner, as well as another member of the class, Myletta Joyner, have fully complied with the provisions of § 2254 (b). *See* 351 F.Supp. at 525 n. 3. Thus, the only question with which we are presented is whether their actions may be taken to fulfill the exhaustion requirements on behalf of the class. We find that they may.

■ The statutory exhaustion provisions serve two salutary purposes. Depriving state courts of the first opportunity to pass on federal constitutional questions would eventually have the unhappy effect of making those courts callous to and ignorant of federal claims. Moreover, other considerations of federalism make clear that it is wise that a federal court decline to inject itself into the orderly administration of state judicial business. But state remedies have been characterized as "ineffective" for purposes of § 2254

(b) not only because they were procedurally inadequate, but also where recent state holdings on a question of substantive law demonstrated that relitigation of the same issue would have proven futile. *See, e. g.,* Reed v. Beto, 343 F.2d 723 (5th Cir. 1965), aff'd on other grounds sub nom., Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); Evans v. Cunningham, 335 F.2d 491 (4th Cir. 1964); Dana·v. Tracy, 360 F.2d 545, 548 (1st Cir.) (dictum), cert. denied, 385 U.S. 941, 87 S.Ct. 311, 17 L. Ed.2d 221 (1966). This "futility" doctrine, of course, comports with the policies underlying the demand for exhaustion in the ordinary case. We must be sure that the state court has had the opportunity recently to consider the identical claim. Moreover, its decision of the issue must be so clear that any further consideration given similar cases by the state court is likely to be summary, so that a federal court entertaining such a case is not likely to disrupt state judicial administration.

■ These same considerations lead us to the conclusion that the exhaustion requirements for the petitioning class have been met by the actions of Sero, Varner, and Joyner. The state court proceedings brought by these three presented an identical challenge to the constitutionality of §§ 75.00 and 75.10. Applications for leave to appeal to the New York Court of Appeals were denied on April 20 and on May 16, 1972, less than six months before Judge Lasker's first decision permitting class status. Under these conditions, we are unwilling to impose upon other members of the class the burden of inundating the state courts with applications which would be as time-consuming as they would be useless.

## IV.

■ What we have said thus far demonstrates that issuance of writs

---

11. In *Braden*—since the case involved the problem of interstate detainer—there was no applicable venue statute. The Court none-

theless based its choice of forum upon "traditional venue considerations." 410 U.S. at 493, 499 n. 15, 93 S.Ct. 1123.

granting release was proper as to those young adults—either in confinement or on parole—who served more time in correctional facilities than the maximum terms provided for adults guilty of the same misdemeanors. We also believe it is clear that those who on the effective date of the district court's decree had not yet been released on parole, but had at that time served less than the corresponding adult terms, were properly entitled to resentencing.[12] There remains to be determined, however, the treatment due those class members who were already on parole at the time of the decree below, after having served shorter terms in prison than would have been given to adult class A and class B misdemeanants. As to this group the district judge granted release to those whose total time in custody exceeded the maximum adult sentence, and ordered resentencing for the remainder. With this latter determination, we do not agree.

Although extensive discovery was had on the issue of treatment given young adults in correctional facilities, the only evidence relevant to the conditions of parole discloses an issue which we are unable to resolve on the record before us. *See* United States ex rel. Bradshaw v. Alldredge, 432 F.2d 1248 (3d Cir. 1970). The Statement of Substantial Undisputed Facts submitted by the petitioners on their motion for summary judgment states:

17. There is no special parole service for reformatory-sentenced offenders except that assigned case loads of "Youthful Offenders" (males only) are made to certain parole officers in New York City.

The respondents' answer, however, "dispute[d] the allegation that the only special parole service which is available to reformatory sentenced inmates concerns Youthful Offenders." Although Judge

Lasker properly found that identical conditions of confinement justified release or resentencing as to part of the class, he made no such determination regarding the parole services available to young adults and adults respectively. Because the provision of unique services would under some circumstances justify a longer period of parole, we remand this issue for further factual determinations and disposition consistent with this opinion. In all other respects we affirm.

---

12. Because we find it impossible to assess the likelihood that these inmates will be released on parole before they have served

adult-length sentences, we find resentencing a more appropriate treatment than that given the remainder of the class, *infra.*